69 N.J. Super. 544 (1961)
174 A.2d 520
IN THE MATTER OF THE ESTATE OF FRANK FLYNN, DECEASED.
Superior Court of New Jersey, Chancery Division.
Decided October 6, 1961.
*547 Messrs. Pitney, Hardin & Ward, attorneys for Alfred I. Manson, Jr., executor.
Mr. John J. Hanlon, Jr., pro se, as guardian ad litem of Catherine Shaughnessey Smith and Mary Shaughnessey Rooney, incompetents.
Mr. Arnold Tulp, pro se, as guardian ad litem of Christine D. Hayes, Brian H. Hayes, Barry U. Hayes, Leonia M. Norton and Donn H. Norton, and as attorney for said Donn H. Norton, now serving in the armed forces of the United States.
Mr. William E. Bannon, attorney for Rose Geist Brown, Catherine Hoye, Loretta Pratt, Rose V. Finneran Mihm, Harold Finneran, Frank Finneran and Lillian Puff Fraser.
HERBERT, J.S.C.
Frank Flynn, a resident of East Orange, died on April 17, 1959. He left a will dated January 27, 1959. His executor has now completed to a *548 large extent the administration of the estate and seeks the instructions of the court on a number of problems which must be resolved before distribution of the residue can be made. There being no disputed questions of fact, the matter has been submitted for decision upon the verified complaint, without the taking of any testimony, and thorough briefs on the questions involved have been filed.
Mr. Flynn had only personal property at the time of his death. It had a total inventory value of $290,020.21. He left specified amounts of money to 14 individuals and to three churches, as well as certain legacies of rugs, furniture, other household equipment and books. Following this long list of legacies  about which there are no questions  he provided for the residue of his estate as follows:
"TWENTY-FOURTH: All the rest, residue and remainder of my estate, of whatsoever kind and wheresover situate, of which I may be seized or possessed or to which I may be entitled at the time of my decease, shall be distributed as follows:
(A) I hereby give and bequeath the remaining cash assets of my estate, including securities, to the beneficiaries named in paragraphs `Fifth' to `Eighteenth,' inclusive, in proportionate shares, the ratio of each proportionate share to the total residuary cash including securities to be in the same ratio that each specific bequest in said paragraphs `Fifth' to `Eighteenth,' inclusive, bears to the total amount of such specific bequests in said paragraphs contained. If the specific bequests contained in paragraphs `Seventh' and/or `Ninth,' above, should lapse because of the happening of the contingency therein referred to, then, and in such event, the beneficiaries entitled to share in my residuary estate under this subparagraph shall be those survivors named under paragraphs `Fifth' to `Eighteenth', inclusive, above and their respective proportionate shares in such residue shall be determined upon the basis of their respective specific bequests in relation to the total thereof in said paragraphs contained.
(B) I hereby give and bequeath all remaining property in my residuary estate to such surviving person or persons named above as my Executor may select in the exercise of his or its best judgment, and such action in this respect shall be final and binding upon all the persons concerned."
It is this residuary clause which presents most of the questions.
*549 1. What is the meaning of the phrase "remaining cash assets of my estate, including securities" which limits the subject matter of subparagraph (A) of paragraph Twenty-fourth of the will? At his death Mr. Flynn had several thousand dollars on deposit in New York savings banks. Each of these banks, except one, might have insisted upon 60 days' notice before permitting a withdrawal. He also owned a lady's diamond ring which he had delivered to a jeweler with instructions for sale, but the sale did not take place until ten days after the date of death. Another questioned item is a claim by Mr. Flynn for personal injuries which was the subject of settlement negotiations when he died, actual settlement having been made about six months later.
Three life insurance policies payable to the estate, an unsecured loan made to the Reverend Donald J. Nobel (collected after death) and a small lot of miscellaneous chattels are also placed among the questioned items, not by the executor, but by a group of defendants who are first cousins of Mr. Flynn.
It may be noted that the words "remaining cash assets of my estate, including securities" are followed at a later point in the same sentence by the phrase "total residuary cash including securities," and the two expressions are apparently used in the same sense. There is some conflict between the testator's use of the quoted words and the common understanding of the "residue" of an estate. If, on the day a will is probated, the sole beneficiary of the residuary clause asks what his share is or will be, counsel for the estate will almost surely tell him that no specific answer can be given until debts, taxes and general administration expenses have been paid and the residue thus determined. By the time the residue is defined in that way at least some property owned at death probably will have been turned into cash. I am satisfied that Mr. Flynn meant "cash assets" owned by him at the time of death, and did not mean to include assets turned into cash by the executor *550 while administering the estate up to the point where it would become possible to state accurately how much of the gross estate would pass under the entire residuary clause. To hold otherwise would allow the speed of the executor in converting assets into cash to determine the meaning of the will; and would, in the case of a quick-acting executor, leave little or no significance to be attached to the words "all remaining property in my residuary estate" which appear in subparagraph (B) of paragraph Twenty-fourth. I have, therefore, considered that subparagraph (A) with its "cash assets" and subparagraph (B) with its "all remaining property" must be taken together so as to include, as of the time of death, all that portion of the estate not bequeathed by earlier clauses of the will.
Savings bank accounts: I conclude that they are all "cash assets," and are to be disposed of under subparagraph (A) of paragraph Twenty-fourth of the will. It is true that six of the seven banks might have insisted upon 60 days' prior notice as a condition of withdrawal, yet actual use of such a requirement has been so rare among banks that no informed person would think of a savings account as anything but a cash asset. I am satisfied that Mr. Flynn would have thought of his savings accounts as immediately available in his lifetime for payment of bills, emergency use, or any purpose at all, and, subject to the necessary routine of probate and tax waivers, immediately available for use by his executor. Brearley, ex'r. v. Lalor, 15 N.J. Eq. 108 (Ch. 1862), which held that a savings bank deposit was not covered by the testamentary designation "moneys which I have at the time of my decease," would hardly reflect the thinking of any testator today. And in any event, Mr. Flynn used "cash assets" rather than the narrower "cash" or "moneys."
Life insurance policies: Counsel for cousins of the testator and for the guardian ad litem of two incompetent cousins have assembled a number of authorities which make it clear that life insurance policies have often been considered *551 by the courts as far more than simple obligations to pay a sum of money. It is argued from these authorities that the policies on Mr. Flynn's life were not "cash assets." I cannot agree. The testator's intent, of course, controls. When making his will he would think of these policies as matured obligations to pay sums of money into his estate. Other contract features would be pushed into the background when thinking of death and the effect of a will. One type of sales effort of the life insurance companies is to urge that a policy payable to an executor will supply ready money to pay death taxes and other immediate obligations. Mr. Flynn, holder of seven policies in five companies, must have been exposed, directly or indirectly, to that argument.
Immediately upon qualifying, the executor was in a position to collect money from the insurance companies, just as he was from the savings banks. I am satisfied Mr. Flynn intended the three life insurance policies which were payable to his estate, and the proceeds of those policies, to be included within the designation "cash assets," and so hold.
Loan to the Reverend Donald J. Nobel: The amount owed the testator at date of death was $500. There is no proof that this was a long term obligation or had any conditions attached to it to take it out of the current asset class. Actual collection by the executor has been made, which is some indication the loan was callable on demand or at least was short term when Mr. Flynn died. I am satisfied that the Nobel loan was a "cash asset" within the intent of the testator, and so hold.
The Diamond Ring: Mr. Flynn owned this when he made his will, decided sometime thereafter to sell, and placed it with a jeweler for sale. It was not sold until after he died. I am unable to conclude that the ring was a "cash asset." No authorities have been cited which support the argument that it is. Had Mr. Flynn lived, he might have changed his mind about sale. If no buyer had been found to pay the stipulated price, a reduction might have been necessary. The sale, instead of taking place quickly, might *552 have been delayed for months for want of a buyer. These are all contingencies which stood in the way of converting the ring into money.
The executor has submitted an affidavit which states, among other things, that Mr. Flynn was trained as an accountant.
Would an accountant consider a diamond ring a "cash asset"? I doubt that anyone with business experience would do so, and have greater doubt that an accountant would. The executor's brief quotes the following dictionary definitions of "cash assets":
Webster's New International Dictionary (2d ed. unabridged, 1937), p. 166:
"* * * Cash assets consist of money, or of obligations on which a determinate sum of money can be realized * * *."
Kohler, A Dictionary for Accountants, p. 88 (1957):
"Cash and any asset which may be converted immediately into cash without upsetting day-to-day operations. Examples: Cash on hand, cash deposited in banks; cash in transit; demand certificates of deposit; trade acceptances * * *."
The ring was not an article on which a "determinate sum of money" could be realized, nor could it be "converted immediately into cash." I am convinced that the ring, even after delivery to the jeweler to find a buyer, was "remaining property" within the intent of the testator and was not a cash asset.
Other chattels: Certain tangible personal property is referred to at the head of page 5 of Schedule A of the executor's account. It has been appraised at a total of $1,450.75. This total, as I understand, includes the values of some articles which were specifically bequeathed to legatees, but that is important for present purposes only to make clear that what I am about to say applies to all tangible personal property (other than the diamond ring already discussed) which would pass under paragraph Twenty-fourth of the will as a part of the residue of the estate.
*553 It follows from the views I have expressed above, especially about the diamond ring, that all tangible personal property owned by Mr. Flynn at his death and not disposed of in a paragraph of the will other than paragraph Twenty-fourth is to be disposed of in accordance with subparagraph (B) of paragraph Twenty-fourth, and I so hold. That tangible property is not to be classed as "cash assets" and distributed under subparagraph (A), and it therefore becomes "remaining property" governed by subparagraph (B).
The claim for personal injuries: Much of what has been said above concerning the diamond ring is applicable to this claim. I am convinced that Mr. Flynn, especially with his knowledge of accounting, would not have thought of it as a cash item. He could not know how much, if anything, he would collect, and the time for collection was obviously not immediate.
I have determined that the savings bank accounts, the life insurance policies payable to the estate, and the Nobel loan are all "cash assets" of the estate and governed by subparagraph (A) of paragraph Twenty-fourth of the Flynn will, and that the diamond ring, lot of miscellaneous chattels and personal injury claim are not "cash assets" but are "remaining property" of the residuary estate and governed by subparagraph (B) of paragraph Twenty-fourth; and the executor is so instructed. These determinations, of course, apply to the proceeds of collection, sale and settlement of the several items.
2. Is subparagraph (B) of paragraph Twenty-fourth valid? The question arises because the testator did not select the beneficiaries and fix their legacies, but undertook to give his executor power to do that. Did he go so far in that direction as to make no will at all relating to the property which is the subject of subparagraph (B)?
Many courts have been faced with this same problem in one form or another, and it has been discussed by text writers. The authorities which have been thoroughly collected in the briefs filed are not entirely consistent, but it *554 appears accurate to say that when a personal gift to the fiduciary can be ruled out (and the executor here does not even make a suggestion of a personal claim) then, assuming adequate identification of the property, the validity or invalidity of the testamentary provision will depend upon whether the testator has sufficiently identified a class of beneficiaries. There is a New Jersey precedent which in my judgment controls the result here and requires a holding that subparagraph (B) is valid  Lundie v. Walker, 126 N.J. Eq. 497 (Ch. 1939). Mr Walker's will directed that the residue of his estate be converted into money and distributed by the executor "to such of my relatives me surviving, and in such manner and proportions as he, my executor hereinafter named, may deem wise, just and prudent." The executor did in fact select some relatives and made distribution to them in varying amounts  action which was upheld by the court against the contention of certain relatives that heirs and next-of-kin should take the residue by intestacy. Comment applicable to the Flynn will was made, 126 N.J. Eq., at p. 500:
"The terms by which the direction and power were conferred on the executor being to distribute and disburse the decedent's residuary estate among such of decedent's relatives who might survive him and in such proportions as the executor might deem wise, just and prudent, the executor had an exclusive power in his discretion to select the beneficiaries from among such relatives, excluding such of them as he saw fit, and to determine what proportion of the estate each relative selected should receive. Cochran v. Elwell, 46 N.J. Eq. 333: affirmed, sub nom. Campbell v. Cochran, 48 N.J. Eq. 307. The power of appointment, so far as the selection of beneficiaries and the allotment made to each, was exercised in accordance with the decedent's directions."
To the same effect see 3 Page on Wills (3d ed. 1941), sec. 1326, p. 892; and, as to dispositions made in the form of a trust, 1 Restatement Trusts 2d, secs. 120, 121 and 122; First Mechanics National Bank, adm'r v. First Mechanics National Bank, ex'r, 137 N.J. Eq. 106 (Ch. 1945).
*555 For reasons to be discussed below, I conclude that Mr. Flynn defined a class of beneficiaries much more definite and ascertainable than if he had said "my relatives," and sufficiently definite to made subparagraph (B) of paragraph Twenty-fourth of the will a valid testamentary provision under which the executor can and should exercise his discretionary powers of selection and distribution.
3. What is the meaning of the phrase "to such surviving person or persons named above"? These words appear in subparagraph (B) of paragraph Twenty-fourth. Unless they designate a definite class, then the legal conclusion reached in the immediately preceding section of this opinion cannot be applied, and there would be a partial intestacy. It is argued for the cousins, among other points, that no "surviving person or persons" are "named above." Even if this emphasis upon the word "surviving" could be accepted, the factual assumption of the argument is not strictly true. In paragraph Seventh, for example, a bequest to L.S. Carpenter is to go to his wife if he dies and if she "survives him." There are at least three other legacies provided for in the same terms. However, I think it clear that Mr. Flynn intended his executor to make a selection among living persons and that the word "surviving" was used as a somewhat inartistic, although sufficient, expression of that idea. No practical problem is presented, for the list of interested parties which appears in the complaint shows that all legatees and contingent legatees named by the testator are alive.
The words "person or persons named above" can be read in a number of ways. In subparagraph (A), which immediately precedes the use of the quoted words in subparagraph (B), no persons are named by name, but they are identified by reference as "the beneficiaries named in paragraphs `Fifth' to `Eighteenth'." If the incorporation of names by reference in subparagraph (A) furnishes a sufficient basis for designating in subparagraph (B) the bearers of those names as "persons named above," then there *556 is no problem about identifying the members of the class. As an alternative, "above" might be taken as a reference to all parts of the will preceding subparagraph (B), and, if so, might be taken to include or exclude the churches, the Society For The Libraries Of New York University, and the wives who were named to take legacies if their husbands should predecease Mr. Flynn.
Considering the whole will, it is my conclusion that Mr. Flynn intended to have his executor select, under subparagraph (B), from the same group of persons designated to take shares of the residue under subparagraph (A). Even if the word "above" is read as a reference to all preceding sections of the will, I am satisfied that the words "person or persons" were not intended to include the churches. It would have been particularly unlikely for Mr. Flynn, with his education, or for the New York attorney who drafted the will, to omit at this point in the will the word "churches" and rely only on "persons" if the possibility of a further benefit in that direction had been intended. It also appears to me that the wives who were named only as contingent legatees in the event of the death of their respective husbands should be excluded. Though Mr. Flynn, in a literal sense, named them, he did not name them in the full sense of legatees but only as alternates. I conclude that Pearl Dykeman Carpenter and Mary Carpenter (their husbands being still alive) are not in the group to be considered by the executor in making his selections.
What I have already said concerning the churches also applies to the Society For The Libraries Of New York University. It cannot be included in the group because it is not a "person."
The executor is instructed to make distribution of the property governed by subparagraph (B) of paragraph Twenty-fourth to such persons as he may select in the exercise of his best judgment from among the persons who received legacies under paragraphs Fifth through Eighteenth, including the several children for whose benefit  apparently *557 because of their minority  legacies were made payable to their parents.
4. Are beneficiaries of life insurance policies on Mr. Flynn's life required to pay a share of the federal estate tax? The will contains this provision:
"TWENTY-SIXTH: I hereby direct that any and all taxes, both State and Federal, which may be imposed by any law now in force or which may hereafter be enacted, upon my estate, or upon the transfer thereof, shall be borne and paid out of my estate and I direct that my Executor pay all such taxes out of the residuary estate."
When the will was made our statute on the apportionment of taxes had already been adopted. N.J.S. 3A:25-30 et seq., L. 1950, c. 327, p. 1096 et seq. That act by its terms does not, however, govern apportionment in a case "where a testator otherwise directs in his will" (N.J.S. 3A:25-31), and the sufficiency of the testamentary direction must meet the test of N.J.S. 3A:25-34, which reads:
"Limitation on direction for apportionment or non-apportionment of tax.
Any direction as to apportionment or nonapportionment of the tax, whether contained in a will or in a nontestamentary instrument, shall be limited in its operation to the property passing thereunder unless such will or instrument otherwise directs."
Reading paragraph Twenty-sixth of the will in conjunction with all other provisions, I am satisfied that Mr. Flynn's direction about apportionment must be limited to property passing under the will. This is not a case in which the instrument "otherwise directs."
A look at the surrounding circumstances confirms, rather than weakens, this conclusion. The insurance payments are not large, ranging from $6,200 down to $470. Each beneficiary was named in only one policy and, with one exception, each of them also became entitled to a legacy under the will, including a share of the residue. The member *558 of the group who is entitled to nothing from the executor is the beneficiary of the smallest policy.
In re Berman, 49 N.J. Super. 95 (Cty. Ct. 1958), presented facts which enabled the court to say that charging all taxes to the residue of the testamentary estate would promote the primary objective of the testator and therefore supported a finding that the will contained a sufficient direction against apportionment to rule the statute out. No such factual situation is presented here. Without intending to belittle the burden of taxes on the insurance payments it can be said that it is not heavy enough to have any obvious effect, one way or the other, upon Mr. Flynn's major objectives. In addition, the language in the Berman will, standing alone, is a stronger expression against apportionment than any words Mr. Flynn used.
I do not overlook, in paragraph Twenty-sixth, the words "taxes * * * upon my estate, or upon the transfer thereof." When it went beyond "estate" I think the language used was merely a recognition by the testator and his counsel of the existence of another type of tax on property owned at death, such as New Jersey's transfer inheritance tax, and was not a statement of intent that the residue of the estate should bear the taxes assessed on the basis of life insurance moneys paid to individuals named in the policies.
The executor is instructed that paragraph Twenty-sixth of the Flynn will does not relieve the beneficiaries of the life insurance from paying, under the provisions of N.J.S. 3A:25-30 et seq., their respective proportionate shares of the federal estate tax.
The executor has filed his first intermediate account, and it has been audited by the clerk. No exceptions have been taken and the account is approved and allowed as filed.
Jurisdiction will be retained as prayed for by the executor, over any future proceedings in relation to the administration of the estate.